Filed 8/12/26  In re R.M. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re R.M., a Person Coming Under the Juvenile Court Law. | B347837<br><br>(Los Angeles County Super. Ct. No. LB0107A) |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>R.M.,<br><br>    Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Sabina A. Helton, Judge.  Affirmed.

Kristen Owen, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant

Attorney General, Wyatt E. Bloomfield and Chelsea Zaragoza, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

In 2023, the People filed a juvenile wardship petition alleging R.M. participated in a drive-by shooting and murder when he was 17 years old.  The People moved to transfer R.M. from the juvenile court to a court of criminal jurisdiction pursuant to Welfare and Institutions Code section 707, subdivision (a)(1).[1]  The juvenile court determined R.M. was not amenable to rehabilitation while under the juvenile court's jurisdiction.  On appeal, R.M. contends the People failed to carry their burden of proving by clear and convincing evidence that he was not amenable.  He further contends the court erred in reaching its conclusion in the absence of comprehensive expert testimony on amenability, and by considering rehabilitative attempts made in connection with the current offense when assessing the success of any prior juvenile court attempts at rehabilitation.  We affirm.

## SECTION 707

"Section 707 sets forth the procedures for transferring a minor from juvenile court to criminal court.  It provides that whenever a minor aged 16 years or older is alleged to have committed a felony, the prosecutor may move 'to transfer the minor from juvenile court to a court of criminal jurisdiction.' (§ 707, subd. (a)(1).)  The prosecution bears the burden of proving that the minor should be transferred.  (Cal. Rules of Court,

———————————

[1]     All undesignated statutory references are to the Welfare and Institutions Code.

2

rule 5.770(a).)" (*In re Miguel R.* (2024) 100 Cal.App.5th 152, 164 (*Miguel R.*).)

Section 707, subdivision (a)(3), provides: "In order to find that the minor should be transferred to a court of criminal jurisdiction, the court shall find by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court. In making its decision, the court shall consider the criteria specified in subparagraphs (A) to (E), inclusive. If the court orders a transfer of jurisdiction, the court shall recite the basis for its decision in an order entered upon the minutes, which shall include the reasons supporting the court's finding that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." The requirement that the court recite the basis for its decision "means the court should 'explicitly "articulate its evaluative process" by detailing "how it weighed the evidence" and by "identify[ing] the specific facts which persuaded the court" to reach its decision' whether to transfer minor to a court of criminal jurisdiction." (*In re S.S.* (2023) 89 Cal.App.5th 1277, 1294 (*S.S.*).)

The relevant criteria are: 1) "[t]he degree of criminal sophistication exhibited by the minor" (§ 707, subd. (a)(3)(A)(i)); 2) "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction" (*id.*, subd. (a)(3)(B)(i)); 3) "[t]he minor's previous delinquent history" (*id.*, subd. (a)(3)(C)(i)); 4) "[s]uccess of previous attempts by the juvenile court to rehabilitate the minor" (*id.*, subd. (a)(3)(D)(i)); and 5) "[t]he circumstances and gravity of the offense alleged in the petition to have been committed by the minor" (*id.*, subd. (a)(3)(E)(i)). These criteria "are based on the premise that the minor did, in fact, commit the offense." (*People v. Superior*

3

*Court (Jones)* (1998) 18 Cal.4th 667, 682 (*Jones*).)  The court must also consider enumerated factors relevant to each criterion. (§ 707, subd. (a)(3)(A)(ii), (B)(ii), (C)(ii), (D)(ii), (E)(ii).)

"[T]he court has the discretion to conclude that one or more of the five factors predominate so as to determine the result, even though some or all of the other factors might point to a different result." (*In re E.P.* (2023) 89 Cal.App.5th 409, 417; accord, *Miguel R.*, *supra*, 100 Cal.App.5th at p. 167 ["the statute does not require that any . . . criteria be afforded any greater weight than any other"].)  "[T]he ultimate finding that the juvenile court must make under section 707(a)(3) concerns a global assessment of the minor's suitability to rehabilitation within the juvenile court system . . . ." (*Miguel R.*, at p. 167.)

## FACTUAL AND PROCEDURAL BACKGROUND

### *Underlying Offense*

In the afternoon of January 21, 2023, a minor, Khalil S., was shot and killed during a drive-by shooting at Silverado Park in Long Beach, where he was playing basketball.  Gunfire struck another victim in the abdomen and a third victim in the thigh. Both survived.  Khalil S.'s younger brother was also on the basketball court at the time of the shooting but was not injured.

A few weeks before the shooting, R.M. arranged to buy a gun from a co-minor.

Approximately an hour before the shooting, R.M. began a live broadcast on his Instagram account while he and two co-minors were outside an apartment complex associated with the Bricc Boys gang.  R.M. was associated with the Black Bandits gang, which is a rival of the Bricc Boys.  Someone commented on the broadcast: " 'The toast is out I repeat,' " " 'Playing basketball thinking shit sweet,' " and " 'They hoopin on the west.' "  "Toast"

4

is a term rival gangs use to refer to the West Coast Rollin 80s, which claim the west side of Long Beach and specifically Silverado Park.

R.M., who was driving his mother's car, took an indirect route to get from the apartment complex to Silverado Park. He then drove past the park, returned with the passenger side facing the park, and slowed down. A co-minor in the front passenger seat fired 17 rounds.

After the shooting, R.M. drove to the apartment building where he and his family lived.[2] Surveillance video from the mailroom showed R.M. and a co-minor changing clothes, and R.M. making gang signs.

Surveillance video also captured R.M. and co-minors walking from his apartment building towards the location where a shooting at an inhabited dwelling took place shortly after. A witness description of the clothes worn by individuals running away from that location matched clothes worn by R.M. and co-minors.

The evening of the shooting, an Instagram user messaged R.M.: " 'Pick yo man up off the ground. You can't get him back.' " R.M. replied with a laughing emoji. The same user also shared a photo of Khalil S. The day after the shooting, R.M. sent Instagram messages stating that he was trying to sell his gun.

---

[2]    Before the shooting, R.M. exchanged Instagram messages with a co-minor, in which R.M. agreed to pick the co-minor up, but stated he had to bring the car home before 2:00 p.m. The shooting at Silverado Park took place at approximately 1:50 p.m. R.M. returned the car to his family's apartment building at 2:01 p.m.

However, R.M. later wanted to get the gun back from the co-minor who was holding it.

Law enforcement determined the cartridge casings retrieved from the street near Silverado Park and from the location of the inhabited dwelling shooting were fired by the same gun. A firearm slide and barrel located in R.M.'s room created markings that matched the cartridge casings.

### Juvenile Court Proceedings

In March 2023, the People filed a juvenile wardship petition under section 602, charging R.M., who was then 17 years old, with one count of murder (Pen. Code, § 187, subd. (a)) and three counts of attempted murder (*id.*, §§ 664, 187, subd. (a)).[3]

A detention report filed with the juvenile court stated that R.M. admitted street gang involvement. The report recommended that R.M. be detained in juvenile hall. The juvenile court found that the People had made a prima facie showing under section 602 and that it was necessary for R.M. to be detained.

Also in March 2023, the People filed a motion to transfer R.M. from juvenile court to a court of criminal jurisdiction pursuant to section 707, subdivision (a)(1).

In May 2023, the People filed a report by Deputy Probation Officer Havan Ngo. The report discussed the circumstances of the crime and R.M.'s family background. R.M.'s mother denied that he was a gang member. She stated that he had lost his best friend and two family members at a young age. R.M. also had difficulties with bullying at school, which required him to transfer high schools twice. He had 365 unverified absences at

---

[3] R.M. was not charged with any crime in connection with the second shooting.

his current school and was failing multiple classes. The probation officer observed that R.M. had a single parent family, but his home life was not unstable. However, his mother's work schedule prevented her from providing consistent supervision.

The report also addressed the amenability criteria under section 707, subdivision (a)(3). It concluded that the previous delinquent history and success of prior attempts by juvenile court to rehabilitate the minor factors were inapplicable and the remaining criteria supported transfer to a criminal court. The probation officer stated that R.M.'s "overall behavior in the juvenile hall setting has been challenging and remains so at this time." She concluded that R.M. could not be effectively rehabilitated at the juvenile court level and recommended that the matter be considered for transfer to a court of criminal jurisdiction.

In January 2025, R.M. filed an opposition and the People filed a supplemental transfer motion.

### R.M.'s Conduct While In Custody

After R.M. was detained, Instagram accounts posted videos of him throwing gang signs in juvenile hall.

Between May 2023 and May 2025, 17 detention observation reports and three informations to the court were filed concerning R.M.'s conduct in juvenile hall. The reports consistently stated that R.M. failed to follow instructions. There were multiple instances in which R.M. insulted and/or threatened staff, used gang language or gang signs, or went out of bounds.[4] R.M. also

---

[4]     The insults and threats to staff included comments such as: " 'Shut up bitch you are annoying you are a weird ass bitch' "; " 'You dumb bitch, you don't know what you talkin' about, we can

7

engaged in "horse play" that led to fighting and more serious physical altercations with other youths. Staff deployed pepper spray to break up two altercations in which he was involved. R.M. appeared to be under the influence of a substance on a few occasions.

Various reports stated that R.M. negatively influenced other youths. A detention observation report dated July 2023 stated that R.M. "encourages other youths to participate in negative behavior." A report dated October 2023 stated that his behavior "negatively affect[ed] . . . the tone of the unit." An information for the court from the same month stated that R.M. "gang talked with peers," "refused to go to his room during shift exchange," and swore at staff. R.M. displayed this behavior "with a group of others," which "puts all probationers, minors and staff members at risk." In June 2024, a detention observation report stated that R.M. "is sophisticated and adversely impacts and influences the younger youth that are in his housing unit to condone negative behavior." Finally, a report from April 2025 stated that R.M. "began to rile up the group of youths/young adults during shower time," which caused a delay in programming.

Although multiple detention observation reports contained positive case notes, most were either mixed or predominantly negative, including reports filed after the transfer hearing began. Only the final report filed with the court was entirely positive.

---

be wherever we want, fuck you bitch' "; " 'Shut the fuck up, I will knock you out stupid, there is nothing here to do' "; and, around four months before the juvenile court's ruling, when it was time for youths to return to their rooms for the night, " ' "No I will not go down because you are a tramp . . . shut the fuck up." ' "

8

While prior reports typically covered observation periods of approximately one month, the final report covered only a four-day period that coincided with the end of the presentation of evidence at the transfer hearing.

Reports filed between May 2023 and February 2025 stated that R.M. was offered and actively participated in rehabilitative programming.

R.M. began individual therapy in or around October 2023. As of March 2024, he had participated in 30 sessions. Reports filed between May 2024 and January 2025 stated that R.M. continued to participate in individual therapy each week or as needed.

R.M. completed high school in October 2024. At the time of the transfer hearing, he was enrolled in college courses.

### Transfer Hearing

The transfer hearing took place over 10 days between February and May 2025. The juvenile court heard testimony from nine witnesses concerning the circumstances of the underlying offense, as described above; R.M.'s amenability to rehabilitation under the juvenile court's jurisdiction; and the impact of the crime on Khalil S.'s family.

*i.    Probation officer*

Ngo was a juvenile investigator for 30 years. When preparing her report, Ngo reviewed police reports and detention observation reports. At the time of the transfer hearing, Ngo still believed that R.M. was not amenable to rehabilitation while under the jurisdiction of the juvenile court.

Ngo opined that R.M. was not amenable under the criminal sophistication criterion because the crime involved a gun and was a gang-related drive-by shooting. The decision to move from the

9

apartment complex to Silverado Park, to take a longer route, and to drive around the park to position the passenger side of the car towards the basketball courts was evidence of planning that showed criminal sophistication. Changing clothes was also evidence of sophistication "[i]n avoiding detention and identification." Ngo testified that R.M.'s involvement in a second shooting and his attempt to sell the gun the following day also exhibited sophistication.

At the time of the hearing, R.M. was 19 years old, which meant the juvenile court had five years and nine months of remaining jurisdiction over him. Ngo testified that R.M. could not be rehabilitated before the expiration of the juvenile court's jurisdiction based on the serious and violent nature of the crimes and R.M.'s "long history with poor conduct, unacceptable conduct" while at juvenile hall. Ngo testified that detention observation reports showed that R.M. was "disrespectful to staff, disrespectful to the rules," was involved in a physical altercation requiring the highest level of intervention, and possessed contraband drugs, among other negative conduct. R.M.'s statement, recorded in a May 2024 detention observation report, that he did not care about school, following his conditions of probation, or being transferred to county jail, indicated to Ngo that R.M. "ha[d] no plans of cooperating with staff in juvenile hall; that he will continue to be disruptive and dangerous to his unit," and that R.M. "has no respect for the court's receipt of all of his [detention observation reports], [or the] potential consequences of the motion of transfer to adult court." R.M. had been receiving services during the time this conduct occurred, including mental health sessions, but his behavior remained "overwhelmingly

10

negative" and his periods of cooperation were "far and few in between [*sic*]."

Ngo did not believe R.M. was eligible to be sent to a secured youth treatment facility (SYTF) based on the nature of his crimes. She did not consider the possibility of a SYTF commitment when preparing her report. When asked at the hearing to factor the SYTF option into her opinion, she testified that she still believed R.M. was not amenable to remain in the juvenile court's jurisdiction and that he warranted the higher level of supervision that a court of criminal jurisdiction could provide.

With respect to the prior delinquent history criterion, Ngo testified that R.M. had no prior formal charges or petitions filed against him. However, Ngo agreed that a minor purchasing a firearm, making arrangements to sell a firearm, and gang entrenchment were delinquent behavior. She opined that this behavior made him not amenable to remain in juvenile court jurisdiction.

Ngo stated in her report that there had been no prior attempts to rehabilitate R.M. but agreed that he had been detained in juvenile hall since 2023 and had received rehabilitative services during that time. Ngo testified that R.M. had not benefitted from the services he received because they depend on the individual's "acceptance and commitment to the plans for treatment." R.M.'s behavior remained "consistently negative, poor conduct, noncompliant, violent at times," which indicated that the services "ha[d] not worked for him."

Finally, Ngo testified that the offense was serious and R.M. was a primary contributor to Khalil S.'s death. R.M.'s presence in rival gang territory at the time of the shooting indicated to her

11

that he was in a violent mental state, planned the crime, and understood the risks.

During cross-examination, Ngo testified that, since a change in the relevant law in 2021, she had never recommended that a minor remain under the juvenile court's jurisdiction. It was her belief that the juvenile court cannot rehabilitate a minor charged with murder or attempted murder.

*ii.    Forensic psychologist*

Dr. Nancy Kaser-Boyd, a forensic psychologist, prepared an evaluation of R.M. for the defense. She interviewed R.M. and reviewed educational records, probation reports, behavioral observations from juvenile hall, and the police report.

Kaser-Boyd testified that R.M. was raised by a single mother and he helped care for his younger brother. His grandmother helped look after R.M. and his brother until she developed dementia, shortly before the shooting occurred. R.M.'s father was a regional center client and not an active parent. When R.M. was 12 years old, his best friend died in a car accident. When R.M. was 15 years old, an uncle and father figure died suddenly.

R.M.'s mother left for work early in the morning, so R.M. was responsible for getting his brother ready for school. Kaser-Boyd believed that, during the COVID-19 pandemic, there was not "enough structure to keep [R.M.] involved in school." This was "when his behavior started to deteriorate."

To Kaser-Boyd's knowledge, R.M. did not receive counseling or therapy for the losses he suffered before he was detained. He received therapeutic services in juvenile hall. His treating therapist described him as interested and motivated for treatment.

12

Kaser-Boyd's evaluation involved the administration of the Minnesota Multiphasic Personality Inventory, adolescent version. The purpose was to determine whether R.M. was open to self-disclosing and whether he has antisocial personality disorder, which leads to delinquency and criminality. R.M. did not have an elevated score for antisocial personality disorder and scored comparable to the American standard of normal children, which indicated that he was "motivated" and "willing to disclose." He had a slightly elevated score for depression. Kaser-Boyd testified that R.M. may have received negative detention observation reports because he was not "engaged."

Kaser-Boyd did not discuss the underlying facts of the crime with R.M. but reviewed the police report. Kaser-Boyd opined that R.M.'s use of his mother's car and his failure to cover the license plates suggested a lack of criminal sophistication.

With respect to whether R.M. could be rehabilitated prior to the expiration of the juvenile court's jurisdiction, Kaser-Boyd testified that R.M. did not have antisocial personality disorder or a predisposition toward delinquency, which "means that there is nothing about his character that couldn't be changed." He had completed high school, was taking college courses, and had been going to therapy consistently. Although it had "taken a while," he had "started to benefit from the programs that are available" at juvenile hall and "started to show motivation to be educated and to be insightful about himself."

Kaser-Boyd testified that the previous delinquent history and previous attempts at rehabilitation criteria were inapplicable because he had no prior history with the juvenile court system.

Finally, Kaser-Boyd agreed that the crime was grave. However, she testified that "another six years, assuming that

13

SYTF offers good programs, will be very helpful to him."  She concluded that R.M. was amenable to rehabilitation in the juvenile court system.

During cross-examination, Kaser-Boyd testified that she interviewed R.M. once in January 2024 for "about four hours."  Kaser-Boyd agreed that she would probably be able to make a more comprehensive analysis of criminal sophistication if she questioned R.M. about the crime, but did not do so for ethical reasons.

Kaser-Boyd testified that R.M. and his mother both denied that he was a gang member.  She was unaware that R.M. had admitted gang membership in the detention report.  Kaser-Boyd was also unaware that R.M. livestreamed his presence in rival gang territory on Instagram, or that R.M. learned via Instagram that a rival gang was playing basketball at Silverado Park.  She agreed that this showed "some level of contemplating, planning, or executing a plan to drive across the city to find rival gang members."  She also agreed that passing by the basketball court once without stopping "shows a level of scouting for unsuspecting targets" and some level of criminal sophistication.  Kaser-Boyd believed it did "not necessarily" show sophistication as to R.M., as opposed to others in the car, though "[i]t could."

When Kaser-Boyd interviewed R.M. in January 2024, the last detention observation report she received "said his behavior was improving," although she agreed it "now sounds like it wasn't very accurate."  She acknowledged that "the rehabilitation hasn't taken total effect yet because he still has these outbursts."

Kaser-Boyd was "not totally aware" of the programming at the County's SYTF "because it's still in development."  She assumed SYTF staff "are responsible professionals that are going

14

to make interventions that are empirically based." She believed R.M. needed "programming regarding gang membership"; programming to address whether "he ha[s] an issue with women," which could involve "anger management"; and "vocational training and education."

    *iii.*    *SYTF*

Kurtis Miller, a supervising deputy probation officer, testified concerning SYTF programming. He had worked at the Barry J. Nidorf SYTF since it opened in July 2023.[5]

The SYTF offers educational programs "first and foremost," including high school and college courses. A work unit was also in "its infant stages," in which youths complete work projects around the facility and earn a wage. There are various anti-recidivism programs, including mentorship programs, classes on financial literacy and anger management, and a criminal gangs anonymous class. It also offers a drug treatment program, a dialectical behavior therapy program, sports programs, and arts and music programs.

Much of the SYTF programming is also available at juvenile hall, but high populations and behavior issues at juvenile hall make "programming difficult at times." Miller testified: "[T]here is something to be said with young men that come and they have a determinate sentence and they kind of know the plan[,] whereas in [juvenile hall], they're still pre-

---

[5]    Miller testified that there are three probation-run SYTFs in Los Angeles County. In addition to the Barry J. Nidforf facility, Campus Kilpatrick is a "step-down facility," which has less intensive supervision than at Barry J. Nidorf, and allows young men to transition to community-based supervision. The third facility, the Dorothy Kirby Center, is for young women.

adjudicated and things are hanging in the balance. . . .  When they get to SYTF, they know at least, okay, I have a four-year baseline, I have this, I have a treatment plan, and here it is. . . . [B]ut it's still a 50/50 of whether they're going to comply with it or not."

Programming offered at the SYTF is "not required" but "encouraged."  Miller believed all of the SYTF programs are well suited for someone doing a commitment for murder.  He explained that "about 60 percent of our young people are there for murder or attempted murder or some violent crime."  However, amenability "is going to depend upon their interest and their level of commitment."

Staff who are not therapists run the dialectical behavior therapy offered at the SYTF.  Other programming is "by and large" dependent on community-based organizations.  Miller believed the rehabilitative services offered at the SYTF "should be evidence based," and "that's the goal, absolutely."  He could not say "for sure" whether they were.

According to Miller, staffing is a serious issue at the Barry J. Nidorf facility.  The bulk of the staff is not permanent but pulled from field offices for 60 day rotations, which results in safety issues.  Miller also opined that the population is too high "for the purposes of the effectiveness of this program."  Gang-related incidents are prevalent.

*iv.    The murder victim's family*

Khalil S. was 17 when he was killed.  He was in the process of enlisting in the Navy.  He aspired to attend college and provide for his family.  He was not involved in any criminal gang.  Khalil S.'s death devastated his parents and siblings.  His younger

16

brother, also a victim of the shooting, had "shut[ ]down" and remained "really hard to engage with."

### *Juvenile Court's Ruling*

In July 2025, the juvenile court ruled on the transfer motion. The court stated that it had reviewed the motion for transfer and opposition, the probation report, and considered the testimony from "multiple days of hearing with numerous witnesses." The court concluded that the prior delinquent history criterion supported a finding that R.M. was amenable to rehabilitation while under the juvenile court's jurisdiction, but the remaining criteria did not. The court stated that it weighed the criteria as a whole and made a "global assessment" and concluded that the People had shown by clear and convincing evidence that R.M. was not amenable to rehabilitation while under the jurisdiction of the juvenile court.

R.M. timely appealed.

## DISCUSSION

### I. Standard of Review

"We review the juvenile court's ruling on a transfer motion for abuse of discretion." (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 165.) To grant a transfer, the juvenile court was required to find by clear and convincing evidence that R.M. was not amenable to rehabilitation while under the juvenile court's jurisdiction. (§ 707, subd. (a)(3).) "When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. In conducting its review, the court must view the record in the light most favorable to the prevailing party below and give

17

appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011–1012.)

We review R.M.'s legal arguments de novo. (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 165.)

## II. The Juvenile Court Did Not Abuse Its Discretion

### A. Expert opinion on amenability

R.M. contends that the People were required to present expert testimony on R.M.'s amenability to rehabilitation under juvenile court jurisdiction. Although R.M. concedes that Ngo was an expert witness, he asserts her testimony "was based solely on the crime and his participation," that she was "ignorant of the rehabilitative services offered at SYTF," and "did not even consider SYTF or rehabilitation as an option" when preparing her report. He contends her testimony was therefore insufficient to support the juvenile court's conclusion, and the absence of any other expert opinion that he was not amenable to rehabilitation compels the conclusion that the juvenile court erred in granting the transfer motion. We disagree.

Section 707, subdivision (a)(1), requires a probation officer to provide a report addressing "the behavioral patterns and social history of the minor." "Following submission and consideration of the report, and of any other relevant evidence that the petitioner or the minor *may* wish to submit, the juvenile court shall decide whether the minor should be transferred to a court of criminal jurisdiction." (*Id*., subd. (a)(3), italics added.) The statute does not require the People to submit expert testimony concerning a minor's overall amenability to rehabilitation or any specific criterion.

18

R.M. relies on *S.S.*, *supra*, 89 Cal.App.5th 1277, in which the appellate court stated that, "[g]iven the Legislature's refocusing on minors' amenability to rehabilitation, expert testimony will likely be necessary for a complete analysis." (*Id.* at p. 1286.) In *S.S.*, "the only evidence introduced [at the transfer hearing] in addition to the probation report and the psychological evaluation was an autopsy report introduced by the petitioner." (*Id.* at p. 1283.) Neither the probation report nor the psychologist's evaluation expressed an opinion as to the minor's amenability to rehabilitation. (*Id.* at pp. 1282–1283.)

The law imposing a clear and convincing evidence standard on the juvenile court's amenability determination took effect after the transfer hearing but while the minor's appeal was pending. (*S.S.*, *supra*, 89 Cal.App.5th at p. 1284.) The parties agreed that the standard applied retroactively (*id.* at pp. 1281, 1288), and "by urging remand for a new transfer hearing, implicitly agree[d] a more favorable result for minor [was] reasonably probable." (*Id.* at p. 1289.) The appellate court concluded there was a reasonable probability the juvenile court would not have ordered the minor's transfer under the current law. (*Id.* at p. 1291.) It noted that the psychologist who assessed the minor did not express an opinion about whether the former minor was amenable to rehabilitation while under the jurisdiction of the juvenile court. (*Id.* at p. 1283.) The court noted that "proper analysis of this criterion generally requires 'expert testimony concerning the programs available, the duration of any of the programs, or whether attendance would rehabilitate [the minor] before termination of the juvenile court's jurisdiction.' " (*Id.* at p. 1291.) The prosecution in *S.S.* "presented no evidence to demonstrate what minor's rehabilitative needs were" or "why

19

they could not be met within the juvenile court's jurisdiction." (*Ibid.*)

S.S. is distinguishable. Here, the juvenile court expressly applied the clear and convincing evidence standard. Further, in *S.S.*, there was no evidence directly addressing the former minor's overall amenability to rehabilitation or any relevant criteria. Ngo and Kaser-Boyd both testified concerning these issues. Although neither was familiar with the programming available at a SYTF, Miller filled this evidentiary gap. *S.S.* does not hold that a court abuses its discretion in concluding that a minor is not amenable to rehabilitation under the court's jurisdiction unless it has heard testimony from a single expert witness addressing all considerations relevant to amenability.

*J.N. v. Superior Court* (2018) 23 Cal.App.5th 706, is also distinguishable. In *J.N.*, the probation officer's report concluded, "without any analysis," that the minor was " 'unsuitable to be dealt with under the Juvenile Court law.' " (*Id.* at p. 721.) The juvenile court found that the possibility of rehabilitation criterion did not support amenability because the former minor would remain in the juvenile court system for only three more years (*id.* at p. 721), even though the former minor "had done 'pretty well' in custody" (*id.* at p. 714). This was an abuse of discretion. (*Id.* at p. 722.) The appellate court observed that "the prosecution did not present any expert testimony concerning the programs available, the duration of any of the programs, or whether attendance would rehabilitate [the former minor] before termination of the juvenile court's jurisdiction." (*Id.* at p. 722.) The court concluded that "[t]he probation officer's opinion in his report was not substantial evidence because the *opinion* lacked support by substantial evidence. [Citation.] There was no

20

evidence as to the efforts necessary to rehabilitate [the former minor] and no evidence as to why available programs were unlikely to result in rehabilitation in the time allotted. This lack of evidence rendered any opinion based on the report without evidentiary value." (*Ibid.*)

Here, there was testimony concerning the programming that could assist in R.M.'s rehabilitation, the available programming at the SYTF, *and* testimony to support a finding that the services available at the SYTF were unlikely to result in rehabilitation in the time allotted.

In sum, although the "testimony of experts that the minor can be treated by those facilities is entitled to great weight in the court's ultimate determination," "[t]he decision rests in the sound discretion of the juvenile court." (*Jimmy H. v. Superior Court* (1970) 3 Cal.3d 709, 714–715; see also *In re O.F.* (2026) 119 Cal.App.5th 133, 164 (*O.F.*) [recognizing that juvenile court does not abuse its discretion by disagreeing with expert and relying on other evidence].) The evidence presented here permitted the juvenile court to make an informed determination of whether R.M. was amenable to rehabilitation. We reject R.M.'s contention that the absence of comprehensive testimony from the People's expert concerning R.M.'s overall amenability, or amenability with respect to any specific criterion, compels reversal.

### B.    Degree of criminal sophistication

R.M. next contends that the underlying crime lacked sophistication and the juvenile court engaged in "pure speculation" in concluding that aspects of the crime demonstrated planning. We find no abuse of discretion.

21

### i.     *Relevant factors*

When assessing a minor's criminal sophistication, "the juvenile court shall give weight to any relevant factor, including, but not limited to, the minor's age, maturity, intellectual capacity, and physical, mental, and emotional health at the time of the alleged offense; the minor's impetuosity or failure to appreciate risks and consequences of criminal behavior; the effect of familial, adult, or peer pressure on the minor's actions; the effect of the minor's family and community environment; the existence of childhood trauma; the minor's involvement in the child welfare or foster care system; and the status of the minor as a victim of human trafficking, sexual abuse, or sexual battery on the minor's criminal sophistication."  (§ 707, subd. (a)(3)(A)(ii).)

This criterion "requires a juvenile court . . . to consider the whole picture, that is, all the evidence that might bear on the minor's criminal sophistication, including any criminal sophistication manifested in the present crime."  (*Jones*, *supra*, 18 Cal.4th at pp. 683–684.)

### ii.     *Juvenile court's reasoning*

The juvenile court found "there was some level of both planning and search for rival gang members."  R.M. bought a gun approximately one month before the shooting took place and tried to sell it a few days after.  "[T]he crime was not a spontaneous act such as where a youth runs into a . . . rival gang member in some public place and a shooting and a murder occur.  This was a case where [R.M.] and his co-minors seem to be actively searching for rival members and driving to different places looking for them.  And the crime was planned timewise, as [R.M.] needed to get the car home by 2:00 p.m."  R.M. and his co-minors were present in the vicinity of a second shooting where the casings matched the

casings of the gun used in the Silverado Park shooting. However, that the shooting was in broad daylight and R.M.'s use of his mother's car without covering the plates undercut sophistication.

R.M. was 17 years old at the time of the crime and of average intelligence. There was no evidence of family gang history or of peer pressure, although R.M. was with three co-minors. He had a loving mother with a good job and had a normal and happy childhood. R.M. experienced the loss of a friend and uncle, and his grandmother had dementia. The court observed that "there are certainly youth in [its] court that have suffered far more trauma and loss compounded by issues of neglect, abuse, serious mental health challenges and/or poverty" and that R.M. was "not in this category." The juvenile court concluded that the criminal sophistication factor weighed against amenability.

### iii. *Analysis*

R.M. does not dispute that the juvenile court considered the relevant factors. The court's acknowledgment that some aspects of the crime were unsophisticated did not preclude it from finding that this criterion weighed in favor of transfer. (See *Jones*, *supra*, 18 Cal.4th at pp. 683–684 [insufficient evidence supported juvenile court determination that minors lacked criminal sophistication, even though their plan to rob a store "was uncomplicated and ineptly executed"]; *Kevin P. v. Superior Court* (2020) 57 Cal.App.5th 173, 194 (*Kevin P.*) [*Jones* "effectively concluded not only that ineptitude in one's criminal activities does not preclude a finding of criminal sophistication, but also that such ineptitude does not even constitute substantial evidence of a *lack* of criminal sophistication"].) R.M.'s arguments

to the contrary amount to a request for this court to reweigh the evidence, which we cannot do.

There was substantial evidence to support the court's conclusion. Notably, Kaser-Boyd agreed that aspects of the crime discussed by the juvenile court were indicative of "planning" and "scouting for unsuspecting targets." (*In re J.S.* (2024) 105 Cal.App.5th 205, 214 [substantial evidence supported finding of criminal sophistication where "crimes were not spontaneous or impulsive but were indicative of deliberation"].) A reasonable trier of fact could attribute this planning to R.M., who was the driver.[6]

### C. Rehabilitation prior to expiration of juvenile court jurisdiction

R.M. contends this criterion required an expert opinion and that Ngo's testimony was insufficient because she was unfamiliar with SYTF programming. He further argues that the court abused its discretion by failing to consider evidence suggesting that he had grown and matured and had further potential to do so. We disagree.

---

[6] In his reply brief, R.M. contends the juvenile court erred because it "failed to consider this criterion through the lens of amenability." (See *S.S.*, *supra*, 89 Cal.App.5th at p. 1288 ["analysis of the five criteria set forth in the statute should be focused through the lens of amenability to rehabilitation"].) We reject this argument. The juvenile court stated that "[i]n evaluating [the section 707 criteria] through the lens of amenability, [it] reviewed many cases, including *In re S.S.* and *Kevin P. v. Superior Court* and *In re Miguel*." The court was clearly aware of and applied the relevant law. R.M. advances the same claim with respect to the second criterion. That argument fails for the same reason.

24

### i. Relevant factors

When assessing whether a minor can be rehabilitated before the expiration of the juvenile court's jurisdiction, "the juvenile court shall give weight to any relevant factor, including, but not limited to, the minor's potential to grow and mature." (§ 707, subd. (a)(3)(B)(ii).) "[T]he focus of the second criterion is whether there is enough time to rehabilitate the minor while the minor is still eligible to remain under juvenile court jurisdiction." (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 166.)

### ii. Juvenile court's reasoning

The juvenile court recognized that R.M. had over five years of juvenile court jurisdiction remaining. Although the court had warned R.M. of the importance of the detention observation reports before the transfer hearing, the reports remained "overwhelming[ly] negative, although in fairness, there is a sprinkling of positive notes. The negative entries lasted until even after the transfer hearing started. . . . [R.M.'s] language towards staff is both terrible and threatening. . . . He's been in physical altercations in the hall that required the use of pepper spray or pepper spray warning[s], which is the highest level of control used in juvenile hall. He has instances of using gang talk. He's been found with contraband, including THC infused candy, a prerolled joint, and a book of matches. [¶] He has refused to follow direction. He's been suspected to be under the influence at times with red eyes and slurry speech. He's gone out of bounds."

The juvenile court explained that it "take[s] the time to try and parse [detention observation reports] out" and find trends of improving behavior. It found no positive trends in R.M.'s reports. Instead, there was a trend of R.M. influencing others toward negative behavior in reports between July 2023 and April 2025.

The court found it notable that R.M. was "still threatening staff, requiring redirection, engaging in aggressive behavior and going out of bounds," even after the parties announced they were ready for the transfer hearing. The court recognized "there is some truth" to the argument that "juvenile hall is not a place for rehabilitation," but noted that "other youth are turning in good reports, and if not good, reports that are far more positive than [R.M.'s]."

The court found that Ngo's and Kaser-Boyd's opinions were flawed in certain respects. Ngo "seemed to overemphasize the nature of the crime and to not give SYTF serious consideration." Kaser-Boyd's amenability opinion was also "undercut by a number of things." First, Kaser-Boyd opined that R.M. "was a marginal or fringe participant in the gang," even though his conduct before and after the shooting and in juvenile hall contradicted this characterization. R.M. admitted to being a gang member, which Kaser-Boyd did not know. A gang expert testified that it is unusual for murder to be a member's first criminal activity, which suggested that R.M. was not new to gang participation. Second, although Kaser-Boyd testified that R.M. had taken steps to improve his maturity and impulse control and had good insight, those claims were "belied by the negative [detention observation reports]." Third, Kaser-Boyd "did not have a full picture of [R.M.'s] behavior in juvenile hall." Finally, Kaser-Boyd appeared to have "very little knowledge of any actual programs offered at SYTF" and "had no information on community stepdown program[s]," which "undercut" her opinion of whether he could be rehabilitated under juvenile court jurisdiction.

26

The juvenile court noted that the SYTF program is still evolving. It is "50/50 if youth will participate in services or comply, and there is a high level of gang activity in SYTF, and . . . success depends on the youth's interest in rehabilitation and level of commitment. Based on [R.M.'s] behavior, [the court was] not seeing this level of commitment from [R.M.]" The court found that R.M.'s completion of high school, enrollment in college courses, and participation in therapy was "commendable," but "his overall behavior has not changed much in his time of detention." The court had "serious concerns whether there is enough time left to rehabilitate [R.M.] before the expiration of juvenile jurisdiction" and concluded that he was not amenable to rehabilitation based on this factor.

### iii.    Analysis

R.M.'s argument that the People were required to call an expert witness who could address all factors relevant to this criterion is essentially the same argument he advanced with respect to the overall amenability analysis. We reject it for the same reasons.

Substantial evidence supported the court's conclusion that this criterion weighed in favor of transfer. The juvenile court accepted Kaser-Boyd's opinion that R.M. did not have a personality disorder that would limit his capacity for rehabilitation. However, it concluded that Kaser-Boyd's opinion was based on an incomplete understanding of the circumstances of the crime and unsubstantiated view of R.M.'s progress in juvenile hall. Kaser-Boyd essentially admitted as much in her testimony.

We agree that five years is "not an insignificant amount of time." (*O.F.*, *supra*, 119 Cal.App.5th at p. 163.) However, Ngo

27

and Miller testified that an individual's level of commitment determines whether he or she will benefit from rehabilitative programming. At the time of the transfer hearing, R.M. had received therapy and rehabilitative services for approximately two years. Although Miller believed that youths often respond to services better at the SYTF, he testified that the SYTF offers much of the same programming as juvenile hall and also has population issues. A reasonable trier of fact could conclude from R.M.'s ongoing misconduct in juvenile hall there was clear and convincing evidence that he had not demonstrated a commitment to rehabilitation, which called into doubt whether he would commit to rehabilitation at the SYTF.

R.M. argues that the court "myopically" relied on negative reports of his behavior in juvenile hall to the exclusion of positive reports. This amounts to another request for this court to reweigh the evidence. Although R.M. claims there was "increasing improvement in [his] behavior in the more recent [detention observation reports]," a trier of fact could reasonably disagree. One of the more recent reports the juvenile court relied on in its ruling stated that R.M. fought with another youth, "rile[d] up" other youths during shower time, and failed to follow staff orders to move away from the door to another unit. As the court observed, this report was part of a two-year trend of R.M. encouraging negative behavior in other youths while in juvenile hall. The detention observation reports therefore support both that R.M. was not committed to his own rehabilitation *and* that he might impede other youths' rehabilitation if he received a SYTF commitment. That the final report was positive did not require the court to conclude that R.M. was amenable to rehabilitation under this criterion, particularly in the absence of

28

a clear trend of improving behavior. Indeed, the final report was dated only four days after the previous, largely negative report.

The juvenile court did not abuse its discretion by concluding that it was doubtful that R.M. could be rehabilitated while under the court's jurisdiction.

### D. Success of previous attempts at rehabilitation

R.M. contends the juvenile court erred in considering the success of rehabilitation services R.M. received in connection with the present offense under this criterion. We conclude the court's consideration of this evidence was not improper.

#### i. *Relevant factors*

When evaluating the success of previous attempts by the juvenile court to rehabilitate the minor, "the juvenile court shall give weight to any relevant factor, including, but not limited to, the adequacy of the services previously provided to address the minor's needs." (§ 707, subd. (a)(3)(D)(ii).)

#### ii. *Juvenile court's reasoning*

The juvenile court found that because R.M. had no prior history with the juvenile justice system, he had not been provided services through probation and the courts before this case. However, it noted that he had received services while at juvenile hall. "Although there are notes and a letter from DMH, Department of Mental Health, that he participates and is open to services, the [detention observation reports] remain[ed] terrible as described previously." Similarly, despite completing high school and enrolling in college courses, his detention observation reports remained poor. The court concluded R.M. was not amenable under this criterion.

*iii.    Analysis*

In *D.C. v. Superior Court* (2021) 71 Cal.App.5th 441 (*D.C.*), the Court of Appeal considered whether the juvenile court properly considered the former minor's school records and conduct post-dating the underlying offense in connection with the previous delinquent history criterion.  Because the court analyzed the statute's use of the word "previous," its analysis is also instructive with respect to the success of previous attempts at rehabilitation criterion.

The *D.C.* court found that "[t]he statutory language is ambiguous as to whether 'previous' refers to the time before the alleged offense or before the transfer decision." (*D.C.*, *supra*, 71 Cal.App.5th at p. 452.)  Although other criteria expressly concern the alleged offense (e.g., § 707, subd. (a)(3)(A)(ii), (E)(i)), "the five criteria focus on different areas; that two refer to factors existing at the time of the alleged offense does not mean the rest should also.  To the contrary, the statute's express reference to the time of the alleged offense in two instances suggests that where such a reference is omitted—such as in the previous delinquent history criterion—there should be no such limitation." (*D.C.*, at p. 452.)

The court noted that the legislative history was "silent as to the Legislature's intent with respect to the meaning of 'previous,' " but "indicates a general intent that juvenile courts have broad discretion to consider all relevant evidence in making the transfer decision." (*D.C.*, *supra*, 71 Cal.App.5th at p. 454.) "Most significantly, the factors for the five criteria added by the [2015] amendment were expressly made nonexclusive: for each criterion, the statute provides that 'the juvenile court may give weight to *any* relevant factor, including, *but not limited to*,' the identified factors." (*Id*. at p. 455.)  It concluded that "the

30

legislative history of the section 707 criteria indicates an overarching intent to grant judges broad discretion to consider all evidence relevant to this inherently case-by-case determination. Narrowly construing the statutory language to prohibit the juvenile court from considering relevant information would be contrary to this legislative intent." (*Ibid*.) Accordingly, the juvenile court did not err in considering evidence of conduct that occurred after the alleged offense. (*Id*. at p. 456.)

We likewise conclude that the juvenile court properly considered the success of rehabilitation efforts that occurred before the transfer hearing but after the underlying offense. A trier of fact could reasonably conclude that R.M.'s response to rehabilitative services he received in juvenile hall before the hearing was relevant to the court's amenability analysis, even if services provided at the SYTF may have a greater impact than services provided at juvenile hall.

## E. Circumstances and gravity of the alleged offenses

Although R.M. does not dispute that the crime was serious, he contends the juvenile court abused its discretion by concluding that he was actively involved in the commission of the shooting. We again disagree.

### i. *Relevant factors*

When evaluating the circumstances and gravity of the offense, "the juvenile court shall give weight to any relevant factor, including, but not limited to, the actual behavior of the person, the mental state of the person, the person's degree of involvement in the crime, the level of harm actually caused by

31

the person, and the person's mental and emotional development." (§ 707, subd. (a)(3)(E)(ii).)

"[T]he allegation that a minor committed a serious offense, including murder, does not 'automatically require a finding of unfitness.' [Citations.] Rather, in evaluating this criterion, a juvenile court may rely on evidence that, 'while not justifying or excusing the crime, tends to lessen its magnitude' . . . ." (*Kevin P., supra*, 57 Cal.App.5th at p. 189.)

### ii. *Juvenile court's reasoning*

The juvenile court observed that murder is an indisputably grave crime and "[s]hooting into a park in broad daylight where all kinds of people are enjoying a day at the park is reckless and inherently dangerous and serious." The crime was also gang-related and "not an impetuous act, but a planned act."

The court recognized it could consider evidence that "might tend to lessen [the crime's] magnitude in some ways." R.M. was the driver, not the shooter. "However, this is not the type of case where someone is asked to drive a friend to the store and that person has no idea that the friend is planning to commit a robbery, or even if that person has knowledge that the friend is going to commit a robbery, has no idea the friend is carrying a gun." Rather, the court viewed R.M. "as just as culpable and just as much of an active participant in the shooting" because he procured the car and a gun and was the last person who could "make the decision to turn around or not go through with it." There was no evidence that R.M. was forced to participate. The court found "[h]is degree of participation is high" and "[h]e had to have known of the grave consequences of his actions." The court also concluded there was "nothing out of the ordinary for his mental or emotional development." The court also observed that

32

there was extensive evidence of the impact of the crime on Khalil S.'s family.

### iii.    *Analysis*

R.M. argues that the circumstances of the crime could support the finding that he was pressured to participate, which would mitigate the gravity of the offense. This amounts to yet another request for this court to reweigh the evidence, which we decline to accept. There was substantial evidence that R.M. played an active role in the events leading to the shooting and in the shooting itself. Moreover, the record does not suggest that the court improperly relied on this criterion to the exclusion of any other. Rather, the court stated that it weighed the criteria as a whole and made a "global assessment" of amenability.

## DISPOSITION

The order of the juvenile court is affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

ADAMS, Acting P. J.

We concur:

HANASONO, J.

ASHWORTH, J.*

---

\* Retired Judge of the El Dorado Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.